**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2423
_____

ARTHUR JOHNSON,

Appellant

v.

SUPERINTENDENT FAYETTE SCI

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 2-16-cv-04661)
District Judge: Honorable Berle M. Schiller

_____

Argued September 17, 2019


Before:  KRAUSE, MATEY, and RENDELL, Circuit Judges

(Opinion Filed: February 7, 2020)

Craig M. Cooley [ARGUED]
COOLEY LAW OFFICE
1308 Plumdale Court
Pittsburgh, PA 15239

*Counsel for Appellant*

Jennifer O. Andress [ARGUED]
Assistant District Attorney
Max C. Kaufman
Supervisor, Federal Litigation
Nancy Winkelman
Supervisor, Law Division
Lawrence S. Krasner
District Attorney
3 South Penn Square
Philadelphia, PA 19107

*Counsel for Appellee*

_____

O P I N I O N
_____


**RENDELL**, <u>Circuit Judge</u>:

Although we generally rely on jurors to follow a court's instructions, we cannot expect the superhuman from them. Under certain circumstances, jurors cannot practically be expected to follow instructions, no matter how clear or explicit. The classic example arises during a joint criminal trial, in

which one defendant has confessed to the crime and the confession implicates his co-defendant. The confession is admitted into evidence, and the jury is instructed to ignore the confession as evidence against the co-defendant. This asks the impossible of our jurors. In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that in these circumstances we cannot rely on a juror's ability to put such an inculpatory statement out of their minds. Therefore, its admission violates the non-confessing co-defendant's rights under the Confrontation Clause of the Sixth Amendment and requires a new trial if he has been prejudiced by such damaging evidence. More than fifty years after *Bruton*, despite intervening court opinions decrying this situation, courts still confront this problem.

Here, petitioner Arthur Johnson and his co-defendant, Tyrone Wright, were charged with the murder of Donnie Skipworth, who was shot multiple times while dealing drugs in North Philadelphia. Prior to trial, co-defendant Wright confessed to his involvement in the crime. Wright's confession also implicated Johnson by identifying him as the shooter. The prosecution introduced Wright's confession during trial, substituting Johnson's name with "the other guy" in an attempt to avoid a Sixth Amendment Confrontation Clause violation. However, repeated missteps and mistakes made it increasingly clear to the jury that Johnson was indeed "the other guy." The trial court instructed the jury to ignore Wright's confession when considering Johnson's culpability, but a question from the jury indicated that they were having great difficulty doing so. Johnson was convicted of first-degree murder after six days of deliberation.

3

Johnson appealed his conviction to the Pennsylvania Superior Court, which ruled that there was no *Bruton* violation since the substitution of "the other guy," along with the trial court's instruction, was adequate to protect Johnson's Sixth Amendment rights under the Pennsylvania Supreme Court's precedent in *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001). After the state court proceedings concluded, Johnson sought habeas relief in the District Court. The District Court concluded that a *Bruton* violation had occurred and that the Pennsylvania Superior Court's ruling to the contrary was an unreasonable application of federal law. However, the District Court denied habeas relief because it concluded that the *Bruton* error was harmless. For the reasons that follow, we will reverse the District Court's judgment and grant Johnson's petition for habeas relief.[1]

---

[1] The District Court had jurisdiction under 28 U.S.C. § 2254, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Our review over the District Court's denial of Johnson's habeas petition is plenary because the District Court did not hold an evidentiary hearing. *See Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009).

## I.     SIXTH AMENDMENT VIOLATION[2]

We will first discuss *Bruton* and the legal principles at play, and then apply those principles in the context of this case. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant's right to be "confronted with the witnesses against him." U.S. Const. amend. VI. This includes the ability to cross-examine witnesses. *See Pointer v. Texas*, 380 U.S. 400, 404, 406–07 (1965). When a non-testifying co-defendant's statement is introduced, it is in effect the testimony of a witness who cannot be cross-examined. Three Supreme Court cases—*Bruton*; *Richardson v. Marsh*, 481 U.S. 200 (1987); and *Gray v. Maryland*, 523 U.S. 185 (1998)—establish the relevant controlling precedent. We discuss each in turn.

In *Bruton*, the Supreme Court held that a defendant's right to confrontation is violated when a non-testifying co-defendant's confession is introduced in a joint trial, and that confession implicates the other defendant. The Court held that even when the trial court clearly instructs the jury not to consider the statement against the non-confessing defendant, it

---

[2] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)–(e), requires that we "afford considerable deference to state courts' legal and factual determinations." *Palmer v. Hendricks*, 592 F.3d 386, 391–92 (3d Cir. 2010) (citation omitted). As a general matter, we apply AEDPA deference to the Pennsylvania Superior Court's analysis under *Bruton* unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

"cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." 391 U.S. at 137. When such "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," practically speaking, it is as though "there had been no instruction at all." *Id*. at 135–36, 137. In this context, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id*. at 135.

The Supreme Court clarified *Bruton*'s reach in *Richardson*, holding that no constitutional violation exists where a confession is redacted to eliminate "not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211. In those cases, a limiting instruction "may well be successful" since there is not the "overwhelming probability" that the jury will be unable to disregard the inculpatory confession against the defendant. *Id*. at 208. The *Richardson* Court expressed "no opinion" on whether a confession is admissible when a defendant's name is replaced with a "symbol or neutral pronoun." *Id*. at 211 n.5. The Supreme Court refined the acceptable parameters of a redacted confession in *Gray*, holding that redactions cannot be so ineffectual that they actually could signal to the jury that the co-defendant's name was deleted. Such obvious redactions are "similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results." 523 U.S. at 195.

While using a neutral pronoun may satisfy *Bruton* in some circumstances, we have clearly stated that courts should not apply a bright-line rule that such use will never violate

6

*Bruton*. *Bruton* and its progeny require courts to take a holistic approach when considering redacted confessions, by viewing the redaction in the context of the entire record. *See Washington v. Sec'y Pa. Dep't of Corr.*, 801 F.3d 160, 167 (3d Cir. 2015) ("It is not enough to say that because there were redactions of [the defendants'] names that the rules from *Bruton* and *Gray* do not apply."); *United States v. Hardwick*, 544 F.3d 565, 573 (3d Cir. 2008) ("[T]he nature of the linkage between the redacted statement and the other evidence in the record is vitally important in determining whether a defendant's Confrontation Clause right has been violated.").

Here, Johnson and Wright were on trial together. The prosecution alleged that Wright drove the getaway car and Johnson and Abbas Parker approached Donnie Skipworth and opened fire. Abbas Parker ("Baz") was not on trial.[3] The trial court permitted Detective James Burns, who took Wright's confession, to read it to the jury over defense counsel's objections, substituting Johnson's name with "the other guy" or another neutral pronoun, as italicized below:

> Wright: I was driving down Master Street and I seen *some guy*. *He* was walking down Master right by Newkirk. *He* flagged us down and I pulled over. Then *he* opened up my side door and was standing there talking to us. *He* said that *he* seen Donnie up on Thompson

---

[3] The record does not contain any information regarding any prosecution of Abbas Parker.

7

Street and *he* was going to go up and talk to him. Baz was like, I'm a walk up with you. Baz got out of the van and spoke with *him* and then he says to me, yoh, meet us around on 28th and Thompson Street. Then *he* and Baz walked up Newkirk Street and I pulled off. I drove up Dover Street to Jefferson and then down 28th Street and pulled over at Thompson, across the street from the firehouse. I shut the engine off and waited. I was probably there for a minute or two when I heard the gunshots coming from around the corner . . . . I seen Baz come running around the corner. He jumps in the van and starts yelling, we out, we out, we out, pull off. I pulled off and drove down 28th Street.

. . .

Burns:     Did Baz tell you that he shot Donnie?

Wright:    No. He had a gun, but all he said was that *the other guy* shot Donnie.

. . .

Burns:     Did you know if *the other guy* had a gun that night?

Wright:    Yeah. I seen *him* with it right before the shooting down on Master Street. When I pulled up to *him* on Master, *he* was standing at

8

|         |                                      |
|---------|--------------------------------------|
|         | my sliding door and had *his* hands up on the roof of the van talking. *He* had the gun stuck in *his* pants and I could see it. It was a black semi auto with lines on the back of the grip, like grooves cut in the back of the grip. *He* always has that gun. . . . |
| Burns:  | Do you know why *the other guy* wanted to talk to Donnie? |
| Wright: | No, but I found out the next day. . . . The whole neighborhood was talking about it. Everyone was saying that *the other guy* shot the boy over Donnie killing some boy named Nel two years ago on Newkirk Street. Nel was supposed to be *his* boy. |

A. 454–55.

This situation is eerily reminiscent of the fact pattern in *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008). There, the confessing co-defendant informed police that there were only two possible shooters: the non-confessing co-defendant and a third person not on trial. During trial, the two co-conspirators' names were replaced with "my boy" and "the other guy." *Id.* at 274. However, since the third person was not on trial and the prosecution argued the non-confessing defendant "fired the fatal shot," we held that the jury was "almost certain" to identify the non-confessing defendant as the shooter. *Id.* at 281. Like *Vazquez*, here, Wright's confession identified Abbas Parker and an unnamed participant, and since Abbas Parker

9

was not on trial, the confession "sharply incriminated" Johnson, the only other person on trial. *United States v. Richards*, 241 F.3d 335, 346 (3d Cir. 2001) (interpreting *Gray* and finding a *Bruton* error where the co-defendant's confession referred to three people involved in the crime and the non-confessing co-defendant was "only other person involved in the case").

The limited participants in this case made it obvious to a juror who "need only lift his eyes to [Johnson], sitting at counsel table," to determine that he was "the other guy," *i.e.* the shooter. *Gray*, 523 U.S. at 193; *see also Eley v. Erickson*, 712 F.3d 837, 860–61 (3d Cir. 2013) (finding a *Bruton* violation where the non-testifying co-defendant's confession "implicated exactly three people in the crimes and exactly three defendants appeared at the joint trial"); *cf. Priester v. Vaughn*, 382 F.3d 394, 401 (3d Cir. 2004) (substituting "the other guy" did not implicate the defendant because at least fifteen people were involved in the crime). Here, Wright's confession left little doubt that the only other accused sitting at the table with Wright was "the other guy."

Johnson's identity as the "other guy" was also *explicitly* revealed both at the beginning and the end of trial. During opening statements, Wright's attorney informed the jury that "Wright . . . writes down something to the effect of, oh, yes, I know that Arthur and Abbas went there to shoot Donnie Skipworth." A. 326.[4] Johnson was again identified during

---

[4] Objections to this outburst produced only confusing follow up in an attempt to undo the harm. Indeed, in *Vazquez*, we expressed concern that "[o]nce the prosecutor made it clear to the jury that [the confessing co-defendant] had identified [the

closing arguments, when the prosecutor told the jury, "[Wright] tells you in his very own statement. He tells you that he knows that Art is going to go around—excuse me—he knows Abbas . . . ." A. 536.

If there was any doubt about Johnson's identity as the shooter, after six days of deliberation, the jury sent a note to the trial judge:

> Your Honor,
>
> We the jurors have a question about your instruction regarding Tyrone Wright's statement. You had instructed us that Tyrone Wright's statement may only be used against Tyrone Wright and not against Arthur Johnson. We also recall the Commonwealth saying that we are not being asked to turn off our common sense. We would like to confirm that in order to comply with your instruction, we must not make any inferences stemming from the statement, or use the statement to help draw a more complete picture of the alleged crime in our minds when considering the case against Arthur Johnson. Our understanding is that our instruction is to push the statement from our minds and pretend it

non-confessing co-defendant] as the shooter the situation was no different than it would have been if [the confessing co-defendant's] unredacted statement directly implicating [the non-confessing co-defendant] as the shooter had been admitted into evidence or used from the outset of the case." *Vazquez*, 550 F.3d at 283 n.14.

never existed when we are considering the case against Arthur Johnson. Is this correct?

A. 555. The judge responded to the question by reinstructing the jurors that they could not consider Wright's statement against Johnson. Reply Br. 6.

The jury knew all too well that Johnson was the other guy. There is no doubt that there was a clear violation under *Bruton* of Johnson's Sixth Amendment rights and that the Pennsylvania Superior Court's ruling was an unreasonable application of *Bruton*, *Richardson*, and *Gray*. The jury was told that Johnson was the other guy on two separate occasions during the trial: before the jury even heard the evidence and before the jury went into deliberations. After these identifications, any attempts to conceal Johnson's identity were futile; the cat was already out of the bag. This is a clear *Bruton* violation and we could end our analysis there.

As the above analysis shows, Wright's redacted confession alone would have violated *Bruton* and the Pennsylvania Superior Court should have so found. Instead, the Superior Court found the substitution of the "other guy" equivalent to the use of a neutral pronoun and clearly erred when, focusing only on the confession, it concluded that under the Pennsylvania Supreme Court's precedent in *Travers*, 768 A.2d at 851 (holding that no *Bruton* violation existed where the redacted confession substituted the non-confessing co-defendant's name with a neutral pronoun), there was no *Bruton* violation. The Superior Court wrote the following:

> The [*Travers*] Court concluded that the use of a neutral pronoun was [an] acceptable means of

12

alleviating the Sixth Amendment problem because it is "not an obvious alteration at all" as compared to an obvious deletion of the defendant's name with nothing to take its place.

In the instant matter, the Commonwealth introduced Wright's confession referring to Johnson as "some other guy," "some guy," "him," "he," or "the other guy." The trial court twice instructed the jury that Wright's confession was not admissible against Johnson, once before the statement's admission and once during the jury charge. Thus, the facts of the instant matter are precisely in line with *Travers*. Since Johnson's argument runs counter to binding Supreme Court precedent, it fails.

A. 205 (citations omitted). The Superior Court's analysis is devoid of any substantive discussion of the redacted confession within the context of the five-day trial. We agree with the District Court that the Superior Court's determination was an unreasonable application of federal law.

## II. PREJUDICE ANALYSIS

Having concluded that the Pennsylvania Superior Court unreasonably applied federal law, we will next assess whether the *Bruton* error had a "substantial and injurious effect or influence in determining the jury's verdict"—*i.e.*, if it requires reversal. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (citation omitted). *Brecht* requires a finding of "actual prejudice," which is "more than a reasonable possibility that the error was harmful." *Davis v. Ayala*, 135 S. Ct. 2187, 2197–

13

98 (2016) (citation omitted). But reviewing courts need not be certain that a *Bruton* error affected the jury, and indeed, the Supreme Court has "acknowledge[d] the impossibility" of such a determination. *Bruton*, 391 U.S. at 135. Habeas relief must be granted whenever there is "grave doubt" as to the harmlessness of the error. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). In assessing grave doubt, the Supreme Court has cautioned "that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *Id.* at 435. If the matter is "so evenly balanced" that we are in "virtual equipoise as to the harmlessness of the error," we must resolve that balance in favor of the petitioner. *Id*.

The Supreme Court has instructed reviewing courts to consider a "host of factors" in their harmlessness analysis, including:

> the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).[5] In framing our analysis, our role is not to question whether the

---

[5] We have previously applied these factors in assessing the harmlessness of a *Bruton* error under AEDPA, reviewing for whether a state court unreasonably applied *Chapman v. California*, 386 U.S. 18 (1967). *See Johnson v. Lamas*, 850

14

evidence could support a guilty verdict, but "rather, even so, whether the error itself had substantial influence." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also O'Neal*, 513 U.S. at 436–37. "If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos*, 328 U.S. at 765.

The District Court did not conduct an evidentiary hearing, so our review of its harmlessness determination is plenary. *See Thomas*, 570 F.3d at 113. Since the Pennsylvania Superior Court denied relief without addressing harmlessness, we conduct our harmless error review *de novo*. *See Collins v. Sec'y of the Pa. Dep't of Corr.*, 742 F.3d 528, 544 (3d Cir. 2014); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001); *cf. Fry v. Pliler*, 551 U.S. 112, 119 (2007) ("[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.") (emphasis in original). Under this lens, we will review the trial evidence in detail.

## A.      Properly Admitted Evidence

At around midnight on May 4, 2008, Donnie Skipworth was shot multiple times on the 1300 block of Newkirk Street in North Philadelphia. The Commonwealth charged Johnson and Wright with murder based on witness statements and forensic evidence. The trial began on January 28, 2010, and the testimony unfolded over five days.

---

F.3d 119, 133 (3d Cir. 2017). We find these factors for assessing harmlessness equally applicable when *Brecht* provides our standard of review.

The jury knew that Johnson was "the other guy" in Wright's confession before the prosecution even began its case-in-chief. During opening statements, Wright's attorney told the jury that Wright said Johnson and Abbas Parker went to Newkirk Street to shoot Donnie Skipworth. Immediately afterwards, the prosecution called its first witness, Aaron Taylor.

Taylor grew up in North Philadelphia on the 1500 block of Newkirk Street. He had known Johnson and Donnie for a few years while growing up in the neighborhood, however at the time of trial, Taylor had not lived there for over ten years. One month after the shooting, Taylor was arrested on drug charges and taken into police custody. Taylor was later transported to the homicide unit, where he was interviewed by Detective George Fetters about the circumstances surrounding Donnie's death. Taylor then signed a police statement implicating Johnson in the shooting. The statement included the following:

> Look, I was down there on Newkirk like one or two weeks after Donnie was killed and I heard this young boy, Art, talking about how he did it, he killed Donnie, and how nobody had to worry about what [Donnie] had done to Darnell. See, Artie is supposed to be cousins somehow with Darnell and he said he would get Donnie for what he did to his cousin, Darnell.

A. 334. Taylor "guessed" as to the purported conflict between Donnie and Darnell, supplying a motive for Johnson to seek retribution for Darnell's murder:

16

The word was that Donnie got [Darnell] killed. This was about one and a half to two years ago on the same block. See, they was selling drugs together out there, and I guess that Darnell got big headed and Donnie didn't like it. So the word was that he (Donnie) had somebody kill Darnell. I guess it was over the money that they were making out there. You see, Donnie was always the pretty boy type and Darnell was the muscle, and I guess they just got in each other's way.

A. 333. At trial, Taylor unequivocally denied his entire statement to the police and testified that he was "forced into a statement." A. 330. Taylor said he knew nothing about Darnell's death and never overheard Johnson say that he killed Donnie out of revenge for killing Darnell. In fact, at the time of the statement, Taylor said he had moved away from the neighborhood and had not seen Johnson in years.

The prosecution next called Detective Fetters, who testified about his interview with Taylor. Fetters said that in June 2008, Taylor voluntarily approached the police, stating that he had information about Donnie's death. Fetters said that Taylor was cooperative during the interview, and that Taylor had voluntarily signed his police statement. Fetters never asked Taylor why he was providing the statement, but suspected that Taylor did so under the belief that he would receive help on his pending drug charges.

To provide further context for Taylor's police statement, the prosecution next called Detective Theodore Hagan, the homicide detective who investigated Darnell's murder in 2005. However, Hagan's testimony contradicted Taylor's account of Johnson's motive for killing Donnie. Not only did Hagan say Donnie was never implicated in Darnell's murder, he also said that Donnie had actually helped the police identify Darnell's shooter. After Darnell's death, Donnie voluntarily approached the police to provide an eyewitness statement, which then helped police identify and arrest the shooter, Eric Weedon. Eric Weedon pled guilty to shooting Darnell. Hagan also said that Donnie would have been called to testify as an eyewitness to Darnell's murder had the case gone to trial.

The prosecution also called two firefighters, Fire Lieutenant Benny Hutchins and Firefighter Terence Banks, who were on duty at a nearby station the night of the shooting. The station, Engine Company 34, is located on the corner of 28th Street and Thompson Street, about one block away from the shooting. The two firefighters' testimony mirrored each other. Hutchins and Banks both testified that, a few minutes after midnight on May 4, 2008, they heard multiple gunshots from a nearby location and noticed a minivan idling in front of the station on the southwest corner of 28th Street and Thompson Street. Shortly after hearing the gunshots, Hutchins and Banks observed a man walking east on Thompson Street, away from Newkirk Street. The man crossed Thompson Street onto 28th Street and entered the passenger side of the minivan. The minivan immediately left.

Hutchins testified that the man was holding a firearm in his right hand. Banks also testified that the man appeared to

18

be holding a firearm. Hutchins described the man as having a "slender build" and Banks described him as "thin." A. 382, 392. They both confirmed that Johnson was neither thin nor slender, implying that Johnson was not the man they saw the night of the shooting.

Within one minute of the shooting, Hutchins and Banks arrived at the scene, and gave first aid to Donnie Skipworth, who was lying on the sidewalk about thirty or forty feet away from the fire station. Hutchins testified that he was the first one on the scene. Throughout this time, Hutchins did not see anyone else walking away from Newkirk Street.

After the firefighters' testimony, the prosecution called its only eyewitness, the victim's brother, Dion Skipworth. Dion testified that on the night of May 4, 2008, he was selling drugs with his brother Donnie and their two cousins on the 1300 block of Newkirk Street. Dion and Donnie routinely sold drugs on Newkirk Street and that night was no exception. After selling drugs for about six hours, Dion said he saw Johnson walking towards them from the 1200 block of Newkirk Street. Dion and Johnson had grown up in the same neighborhood and were friends prior to the shooting. That night, Dion assumed that Johnson would simply walk past them because he "[f]igured he was going through nothing, so whatever reason to think anything else." A. 402. According to Dion, Johnson walked directly up to Donnie and shot him. Dion testified that Johnson was by himself when he walked up and began shooting. He also said that he had no knowledge that Parker or Wright were involved with the shooting.

After the shooting started, Dion testified that he and his cousins fled, running north on Newkirk Street to his cousin's

19

nearby home. Returning to the scene five to ten minutes later, Dion saw Donnie lying on the ground with bullet holes through his jeans and jacket. In direct contradiction to Hutchins' testimony, Dion said that he was the first person on the scene and there were no firemen there. Dion testified:

> Q: Well, paramedics are already out there. The whole neighborhood is out by that time, aren't they?
> A: Not really.
> Q: So you mean to tell me the firemen aren't there when you come back ten minutes later?
> A: No.
> . . .
> Q: So you were the first person there before any police came on the scene?
> A: Yes.

A. 413.

Dion also offered background information on the dynamics between himself and other individuals in the neighborhood. Dion said that Parker, Wright, and Johnson were close friends and spent nearly every day together prior to the shooting. Dion said that he was related to Parker through marriage and had known Parker his entire life. Dion had also been friends with Wright for years throughout middle and high school. Dion further testified that there had been no animosity or conflict between Donnie and Johnson. Dion testified as follows:

> Q: You never had any problem, you and your brother, with [Johnson] over in the

20

> neighborhood, did you?
> A: No.
> Q: Or any business, did you?
> A: No.

A. 409.  He later continued:

> Q: You were asked if you knew any reason why
>    Arthur would shoot your brother and you said
>    no; is that correct?
> A: Correct.
> Q: There was nothing about no retaliation about
>    any kind of murder, was
>    there?
> A: No.

A. 413.  He again confirmed that there were no issues with Johnson:

> Q: And there is no drama going on between
>    Arthur and the Skipworths or anything else?
> A: No.

A. 417.  Thus, Taylor's statement regarding Johnson's motive for killing Donnie was questionable.

Dion's testimony was impeached several times.  First, Dion did not approach law enforcement until three months after the shooting, explaining that he did so out of fear because "snitches get killed" in his neighborhood. A. 405.  However, cross-examination revealed that his reasons for delay were inconsistent.  At trial, Dion testified that he did not come to the police because he was going to kill Johnson himself, yet at the

21

preliminary hearing, Dion said he needed time to cope with his loss.

Second, Dion was impeached with testimony via stipulation from Officer Victoria Lozada, the responding officer to the scene on the night of the shooting. Dion testified that none of the responding officers questioned him that night. However, Officer Lozada reported the opposite. In an interview with the homicide unit the morning after the shooting, Officer Lozada said, "I spoke to Dion Skipworth. He identified himself as the victim's brother. He had told me that he had seen his brother at the scene and he gave me all the identifiers concerning the victim. He also stated that he did not see the shooting, nor was he with him." A. 511–12.

Third, Dion denied previously speaking with Detective Burns, the officer who interviewed him at length about the shooting when Dion came into the station. However, Burns told a different story. Burns testified that he had previously interviewed Dion in 2006 for a different homicide investigation. He said that Dion was cooperative during the initial 2006 interview but refused to cooperate with police once that case went to trial. Dion repeatedly denied his involvement in the 2006 homicide investigation.

The prosecution did not call any other witnesses to corroborate Dion's testimony. Dion testified that his two cousins, Jermaine and Larry, were present during the shooting, and stood next to Donnie as Johnson walked up and shot him. However, the prosecution did not call Jermaine or Larry to testify. Dion also said that the day after the shooting, he told his brother, Doug, and the rest of his cousins that he saw Johnson shoot and kill Donnie. Again, the prosecution did not

call any of those people to corroborate Dion's testimony. The prosecution argues that other testimony introduced at trial corroborated Dion's testimony, however we find this testimony vague and inconclusive.[6]

The prosecution presented no physical evidence that directly implicated Johnson in the shooting. At the close of trial, the jury was instructed and then proceeded to deliberate for six days.

### B. Strength of the Evidence

We next evaluate the strength of the prosecution's evidence against Johnson. The Commonwealth argues that Wright's confession could not have affected the jury because it was cumulative of other overwhelming evidence. We find this argument unavailing, as the prosecution's two key witnesses were substantially impeached and their testimony was contradicted through other witness testimony. Far from duplicative, Wright's confession served to improperly corroborate their less-than-credible testimony, making it more

---

[6] The medical examiner, Dr. Samuel Gulino, testified that a total of seven bullets entered Donnie's body, in addition to a graze wound and several shrapnel wounds. The wounds showed no evidence of close-range firing. Ballistics expert Kenneth Lay testified that the cartridge cases collected from the scene indicated that they were fired from either a Glock or Smith & Wesson Sigma type pistol. Three bullets were removed from Donnie's body, but the evidence was inconclusive as to whether there were bullets fired from a revolver and a Glock, or possibly also a third gun.

likely that the jury would set aside their doubts in favor of a conviction.

*i.      Eyewitness Testimony*

Although Dion Skipworth's eyewitness testimony would present strong inculpatory evidence on its own, his testimony suffered from significant credibility issues which we cannot overlook.   The Commonwealth argues that Dion's three-month delay stemmed from a fear of being targeted in his neighborhood, however this does not address the other substantial flaws in his testimony, including its inconsistency with his prior statements and conflict with the accounts of Detective Burns and Officer Lozada.

Dion's account of the shooting was also called into question.  The firefighters' testimony suggested that there was a second shooter: the thin man holding a gun who fled the scene and entered a white minivan.   We know from Wright's confession that the thin man was Abbas Parker, who was with Johnson during the shooting, and that Wright was the person driving the minivan.  Yet Dion's account of the shooting placed only Johnson at the scene, and Dion alleges that he had no knowledge of Parker's involvement, to whom Dion is related through marriage.   The prosecution's theory that there were two shooters—Parker firing a revolver and Johnson firing a Glock—contradicted Dion's description of Johnson alone casually walking and opening fire at Donnie.   And Dion did not see the firemen who were clearly at the scene after the shooting.   Lastly, the Commonwealth did not call any other witnesses to corroborate Dion's account of the shooting, including Dion's two cousins who, according to Dion, were standing next to Donnie when Johnson began shooting, or the

24

other family members whom Dion purportedly told that Johnson was the shooter the day after the shooting.

### ii. Evidence of Motive

The Commonwealth relies heavily on Taylor's police statement as having shown Johnson's motive, and erroneously avers that Dion "testified about the history of animosity between Johnson and Donnie." Gov. Br. 27. To the contrary, Taylor's statement is not only unsupported by other record evidence, but also directly contradicted by other witnesses' testimony. Dion testified multiple times that there was no underlying conflict between Donnie and Johnson. Detective Hagan testified that Donnie actually helped arrest and convict Darnell's shooter, Eric Weedon, and provided valuable eyewitness information to the police. These contradictions, combined with Taylor's vehement denial of his police statement and incentive to lie to receive favorable treatment on his pending drug charges, could easily lead a jury to dismiss Taylor's statement as the result of neighborhood gossip.

The lack of overwhelming evidence against Johnson and the substantial flaws with the prosecution's key witnesses leave us in grave doubt about the harmlessness of the error. In *Washington*, we held that an improperly admitted confession created actual prejudice where the non-testifying co-defendant's confession, the source of the *Bruton* error, and a testifying co-conspirator both identified the defendant as the driver, but the testimony suffered from "significant credibility problems." 801 F.3d at 171. We held that the confession, when "viewed in tandem" with the witness's "less-than-credible statement," had a "corroborative effect" that likely affected the jury's verdict. *Id*. Similarly, we find that Wright's

25

confession gave significant weight to Dion's testimony that Johnson was the shooter and validated Taylor's dubious police statement.[7] This corroboration undercut Johnson's effort to raise doubts about their less-than-credible testimony, and likely caused the jury to give it increased weight during deliberations.

### iii. Comparison to Our Prior Case Law

We disagree with the Commonwealth's argument that our prior cases compel a harmless error finding here. The Commonwealth relies heavily on *Johnson v. Lamas*, 850 F.3d 119 (3d Cir. 2017), but there the prosecution presented two eyewitnesses whose identifications corroborated *each other*. We also applied a different standard of review in *Lamas*. There, we applied AEDPA deference to the state court's ruling, and ultimately determined that the error was harmless "even if we might decide the case differently were we to undertake *de novo* review." *Id*. at 134. Here we review the undecided issue of harmless error *de novo*, and the record shows that Dion and Taylor *contradicted* each other with respect to Johnson's motive.

We also do not find, as we did in *Bond v. Beard*, that the prosecution presented "such extensive evidence of [the petitioner's] guilt that the error could not have had a substantial and injurious effect or influence in determining the jury's verdict." 539 F.3d 256, 276 (3d Cir. 2008). In *Bond*, we held that the error "added little to this compelling evidence against

---

[7] As in *Washington*, we are also cognizant of Wright's "inherent incentive to minimize his own culpability as a participant in the events he described." 801 F.3d at 171.

[the petitioner]" where the prosecution presented two eyewitnesses and the defendant had confessed to the police. *Id*. Here, Johnson never confessed to the crime, the Commonwealth's sole eyewitness had substantial flaws, other witnesses painted a picture different from that portrayed by Dion, and the jury deliberations suggest that this was a close case. Indeed, "most of the 'overwhelming' evidence the State points to concerns the [crime] itself," *Adamson v. Cathel*, 633 F.3d 248, 260 (3d Cir. 2011), and *how* Donnie was shot, rather than evidence of *who* shot him. A far cry from the overwhelming evidence against the defendant presented in *Bond*, we do not find that the evidence rendered Wright's confession "of little moment." *Adamson*, 633 F.3d at 261.

## C. Jury Deliberations

The jury deliberated for six full days before returning a verdict against Johnson. On the first day of deliberations, the jury requested a copy of Wright's confession, which the trial judge denied. On the third day, the jury reached a verdict as to Wright, however were unable to do the same for Johnson. The jury wrote the following note to the trial judge:

> At this point, we the jurors have reached a unanimous verdict with regard to the charges against Tyrone Wright. After considerable deliberation, we have been unable to reach a unanimous verdict on the charges against Arthur Johnson. We respectfully request any suggestions or guidance you can provide us at this time.

27

A. 554. After three additional days of deliberation, the jury sent its final note, seeking clarification as to whether they could consider Wright's confession against Johnson, which we quoted above. The jury returned its verdict convicting Johnson of first-degree murder that same day.

The Commonwealth argues that its overwhelming evidence against Johnson rendered Wright's confession of minimal value during deliberations. We find this argument unconvincing. The evidence was not overwhelming and, indeed, could be said to be in conflict and at least confusing. We join our sister circuits in holding that the length of jury deliberations may be one consideration in assessing the strength of the prosecution's case.[8] Here, we find the deliberation period considerable, particularly since it lasted

---

[8] *See Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) ("The length of jury deliberations can be one factor in determining how close the jury viewed the case to be."); *Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) ("[T]he evidence against [the petitioner] was not overwhelming, a fact reflected in the length of the jury's deliberations."); *United States v. Bubar*, 567 F.2d 192, 202 (2d Cir. 1977) (considering the length of jury deliberations to assess strength of the case); *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969) ("[O]ne would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner."); *Osborne v. United States*, 351 F.2d 111, 118 (8th Cir. 1965) ("The fact that the jury deliberated some sixteen hours, covering two full working days . . . lends credence to the view that the case was a close and a difficult one.").

longer than the trial itself.[9]  This, coupled with the jury's request for "guidance" as to the charges against Johnson on the third day, is a strong indication this case was a close call for the jury.

The Commonwealth argues that the jury's final note is evidence that it did not consider Wright's statement "at all" against Johnson, since the note "expressly indicates that the jury adhered to the trial court's instruction."  Gov. Br. 34. While we agree that the note supports that the jury *understood* its instruction, *Bruton* plainly forbids any inference that the jury was *able to follow* it.  The contents of the note, which suggest that the jurors believed they must "turn off [their] common sense" in order to "pretend [Wright's statement] never existed," A. 555, epitomizes the sort of "mental gymnastic[s]" that *Bruton* cautioned against, 391 U.S. at 132 n.8.  The note—which the jury sent on their sixth and final day of deliberations—suggests that Wright's confession infected deliberations and further evinces a lack of overwhelming evidence.

---

[9] Although we do not set a minimum threshold, here we note that six days of deliberation is particularly significant, when compared to other cases addressing this issue.  *See, e.g.*, *Thomas v. Chappell*, 678 F.3d 1086, 1093 (9th Cir. 2012) (nearly five days of jury deliberations); *Dugas*, 428 F.3d at 335 (three days); *Silva v. Woodford*, 279 F.3d 825, 829 (9th Cir. 2002) (two days); *Mayfield v. Woodford*, 270 F.3d 915, 938 (9th Cir. 2001) (nearly two days at the penalty phase); *Murtishaw v. Woodford*, 255 F.3d 926, 968 (9th Cir. 2001) (over two days); *Bubar*, 567 F.2d at 202 (three days); *Dallago,* 427 F.2d at 559 (five days); *Osborne*, 351 F.2d at 118 (two days).

Faced with a lack of overwhelming inculpatory evidence against Johnson, and significant credibility issues with the prosecution's key witnesses, the jury struggled for six days to reach a unanimous verdict against Johnson. The jury sought guidance from the trial judge and grappled with what to do about Wright's inculpatory confession, which they could not unhear. As the evidence balanced on a knife's edge before the jury, we believe that Wright's confession "unfairly infect[ed]" jury deliberations. *Adamson*, 633 F.3d at 261. Wright's confession, when viewed in tandem with Dion and Taylor's less-than-credible testimony, eliminated the space for reasonable doubt in the jurors' minds. In such situations, it is incumbent upon courts to protect defendants against the devastating effects of these egregious errors. Indeed, "[i]t was against such threats to a fair trial that the Confrontation Clause was directed." *Bruton*, 391 U.S. at 136. Accordingly, Johnson is entitled to habeas relief.

## III.   CONCLUSION

For the reasons above, we will reverse the order of the District Court and remand the case to that court for further proceedings consistent with this opinion. The District Court should grant Johnson's habeas petition and order that the state authorities free Johnson from custody unless he is retried within a time fixed by the District Court.