**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-9001
_____

ROBERT WHARTON,
Appellant

v.

SUPERINTENDENT GRATERFORD SCI


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-01-cv-06049)
District Judge: Honorable Mitchell S. Goldberg
_____

Argued on October 11, 2023

Before: HARDIMAN, BIBAS, and PHIPPS, *Circuit Judges*.

(Filed: March 8, 2024)

Helen Marino
Stuart B. Lev **[ARGUED]**
Elizabeth McHugh

Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106

*Counsel for Appellant*

Lawrence S. Krasner
Paul M. George **[ARGUED]**
Nancy Winkelman
Carolyn Engel Temin
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107

*Counsel for Appellee*

Michelle A. Henry
Michelle K. Walsh
Ronald Eisenberg
Hugh Burns
Cari L. Mahler **[ARGUED]**
Office of the Attorney General of Pennsylvania
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403

James P. Barker
Office of the Attorney General of Pennsylvania
Appeals & Legal Services
Strawberry Square, 16th Floor
Harrisburg, PA 17120

*Court-appointed Amicus Curiae for Appellee*

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

A Philadelphia jury convicted Robert Wharton of murder in 1985. The jury found that the crime's aggravating factors outweighed the mitigating factors, so the court sentenced Wharton to death. After exhausting his state court options, in 2003 Wharton petitioned for a writ of habeas corpus in the District Court. He claimed his lawyer was ineffective for failing to introduce Wharton's prison records as mitigation evidence during the penalty phase. The District Court held an evidentiary hearing and denied Wharton's petition. The Court found that Wharton did not suffer any prejudice from his counsel's failure to introduce the prison records because evidence of Wharton's positive adjustment to prison would have opened the door to negative behavior while in custody, most notably his repeated escape attempts.

Because we perceive no error in the District Court's judgment, we will affirm.

I

A

Wharton and his co-defendant Eric Mason were convicted of murdering Bradley and Ferne Hart after the couple refused to pay for unsatisfactory construction work. In the six months before the murders, Wharton and Mason terrorized the Harts, burglarizing their home twice. During the

3

second burglary, they vandalized the home so severely that it was temporarily uninhabitable. As they ransacked the house, Wharton and Mason urinated and defecated on the floor, slashed furniture, defaced family pictures, wrote a threatening note on the wall, and left a doll hanging with a rope tied around its neck. They also burglarized a church founded by Bradley's father, stabbing a photo of Bradley to the wall with a letter opener.

In January 1984, Wharton and Mason forced their way into the Harts' home at knifepoint while the Harts were home with their infant daughter, Lisa. They forced Bradley to write them a check and then tied up the couple. After watching television for several hours, Wharton and Mason decided to murder the couple to avoid being identified. Wharton covered Ferne's eyes and mouth with duct tape before strangling her with a necktie and forcing her head underwater in a bathtub until she drowned. Mason placed his foot on Bradley's back as he strangled him with an electrical cord and pressed his face into a shallow pan of water. Both men stole silverware, jewelry, cameras, wallets, and even Lisa's crib. They also turned off the heat and left Lisa alone in the house in the dead of winter. Bradley's father discovered the gruesome scene three days later. Although Lisa was severely dehydrated and suffered respiratory arrest on the way to the hospital, she survived.

Wharton was arrested about one week later and confessed. Wharton and Mason were convicted in a joint trial, and the jury sentenced Wharton to death while returning a verdict of life in prison for Mason. The Pennsylvania Supreme Court affirmed Wharton's conviction but vacated his sentence because of an erroneous jury instruction on the aggravating factor of torture.

B

Wharton was resentenced in 1992. At that hearing, the prosecution highlighted the prolonged terror campaign against the victims and recounted the gruesome details of the murders, portraying Wharton as a brutal killer who callously left Lisa Hart to freeze to death after torturing and killing her parents. In response, the defense "presented testimony from numerous members of [Wharton's] family regarding his positive attributes as a child and as an adult . . . as well as his positive behavior towards family while incarcerated between his two penalty phase hearings." Amicus Supp. App. 260. The jury heard that Wharton was "very kind," and a "good human," App. 191, 197, as well as "loving" and "very protective" of his mother and sister, App. 142. The jury also learned that Wharton's father suffered a stroke when Wharton was in his late teens, prompting Wharton to tell his mother he would stay and take care of them after his brother left for the military. Wharton's mother testified that he pursued construction work to help build a home for her. She also explained that he stayed in touch with his family and became religious after going to prison. Lamenting that her "son [would] never be free," she broke down in tears and implored the jury to spare his life so they could at least "talk or write to each other." App. 216–18.

Testimony from the defense witnesses contained frequent references to religion, forgiveness, and the value of life. Some of Wharton's family members asked the jury to spare his life for the sake of his family, and because executing him would not take away "the pain that everybody's been going through." App. 168. In closing, the defense tried to undermine the prosecution's list of aggravating factors, arguing that Wharton did not torture the Harts or create a grave risk of death to their infant daughter. Counsel "emphasized to

5

the jury that, if [Wharton] was sentenced to life imprisonment, he . . . would stay there for the rest of his life." Amicus Supp. App. 261. Although the defense briefly raised Wharton's age as a mitigating factor, its general strategy was to plead for mercy based on Wharton's positive character traits and his family's anguish.

During its deliberations, the jury asked whether "evidence of mitigation concerning the character and record of the defendant ha[d] to be present *at [the] time of the offense*." App. 330 (emphasis added). The judge instructed the jury that it could consider mitigation evidence since the murders. The jury also requested that testimony from Wharton's sister-in-law, who had testified to his spiritual growth in prison, be read back to them. After about seven hours of deliberations, the jury declared itself deadlocked. But the judge determined that the jurors had "not deliberated nearly long enough," so he instructed them to continue. In total, the jury deliberated for a little under thirteen hours spread across three days before deciding that Wharton deserved the death penalty.

C

After the Pennsylvania Supreme Court affirmed his death sentence, Wharton sought collateral relief under Pennsylvania's Post Conviction Relief Act (PCRA). Wharton asserted ineffective assistance of counsel at his resentencing hearing based on his counsel's failure to obtain or introduce into evidence prison records purportedly showing that Wharton made a positive adjustment to prison after his first death sentence was imposed. After the PCRA court denied Wharton relief, the Pennsylvania Supreme Court affirmed.

6

Wharton then filed a federal habeas petition. The District Court denied relief but granted a certificate of appealability on one of Wharton's ineffective assistance of counsel claims. This Court expanded the certificate to include defense counsel's failure to investigate or raise evidence of positive prison adjustment, after concluding that Wharton had made a prima facie showing that there was "a reasonable probability that at least one juror would have changed his or her vote if presented with this evidence." *Wharton v. Vaughn*, 722 F. App'x 268, 283 (3d Cir. 2018). So this Court vacated the District Court's order denying Wharton's habeas petition and remanded for the District Court to hold an evidentiary hearing on that ineffective assistance of counsel claim.

D

On remand, the Philadelphia District Attorney's Office (DAO), which had pursued the death penalty against Wharton for decades, reversed course and conceded Wharton's habeas claim. It also said that it would not pursue the death penalty on resentencing. The District Court rejected this concession and appointed the Pennsylvania Office of the Attorney General (OAG) as amicus curiae to investigate the evidence. A multiday evidentiary hearing followed, at which the Court heard evidence of Wharton's behavior in prison during the approximately seven years between his two sentencing hearings.

The first significant event occurred on April 21, 1986, while Wharton was still in the custody of Philadelphia County. While at the Philadelphia County Courthouse for sentencing on an unrelated robbery conviction, Wharton tried to escape as deputies escorted him from the courtroom. Wharton unlocked his handcuffs with a key he was hiding. He then pushed a

7

deputy and fled the building, stopping only when the deputy shot Wharton in the thigh. Wharton later pleaded guilty to the escape attempt.

When he entered death row at SCI-Huntingdon on September 25, 1986, Wharton's prison intake assessment noted that he "used a good deal of denial and rationalization" during his interview and "minimized the few transgressions he admitted to." App. 1554. It also described Wharton "as a sociopath with dependent features and [dis]social attitudes" and characterized him as "an extremely high public risk," both because of his murder convictions and his escape attempt. App. 1550, 1554.

The prison's Program Review Committee (PRC) expressed positive views of Wharton's adjustment. Examples of PRC comments include: "Mr. Wharton has exhibited no adjustment problems," App. 1593; "[t]he attending psychiatrist found Mr. Wharton to be pleasant and cheerful," App. 1600; and "[a]ccording to the counselor, Mr. Wharton has completed another month of positive adjustment. . . . He is pleasant and polite in his counselor contacts." App. 1616. Wharton continued his education in prison by receiving materials in his cell and participating in an education program. He successfully used the prison grievance system to request access to the General Education Degree (GED) test, leading prison officials to commend him for his interest in taking the test. Wharton also played chess, learned Spanish, and participated in a poetry competition.

Wharton exhibited negative behaviors in prison as well, accruing six misconduct violations. The two most serious incidents occurred days apart in May 1989. First, a corrections officer found two pieces of a metal antenna hidden behind the

toilet in Wharton's cell, one of which was fashioned into a handcuff key. A corrections officer testified that it was the only time in his 28-year career that he had found a makeshift handcuff key he "thought would work." App. 962. Several days later, prison officials conducted a random search of Wharton's cell and found another unmodified piece of antenna hidden in his legal papers. This uncommon offense—possessing implements of escape—was one of the most serious offenses an inmate could commit at SCI-Huntingdon. A prison official who oversaw misconduct hearings for the Pennsylvania Department of Corrections testified that he had encountered only about a dozen homemade keys in the thousands of disciplinary cases he had handled.

Wharton "was less than truthful with [the] PRC and denied having anything to do with the . . . handcuff key." App 1614. He received the maximum punishment of 90 days in disciplinary custody for the infractions. Wharton behaved well in disciplinary custody and the prison returned him to administrative custody three weeks early. Yet when Wharton asked the PRC to reinstate his television privileges several months later, he "refused to even discuss why he had . . . two lengths of antenna" because "[h]e did the time." App. 1618.

Wharton also had four other less serious misconducts. In 1986, Wharton refused to submit to a strip search, claiming a back injury. In 1988, he and other inmates refused to leave the exercise yard when ordered to do so by prison officials. In 1989, he broke the rules by circulating a petition related to phone privileges. Finally, in 1992, Wharton and another inmate disobeyed orders to stop practicing martial arts in the exercise yard.

Wharton's defense counsel testified at the evidentiary hearing and confirmed that he did not obtain or review Wharton's prison records as part of the 1992 resentencing. He conceded that "[t]here was no strategy involved"; he simply did not know he could introduce prison adjustment records as mitigation evidence under *Skipper v. South Carolina*, 476 U.S. 1 (1986). App. 534, 571.

After assessing this evidence, defense experts testified that Wharton's prison adjustment was positive, concluding that Wharton was unlikely to present a danger in the future because he was older and had no major mental illnesses, sociopathic behaviors, or violent misconduct while in prison. The defense experts also concluded that Wharton's frequent use of the grievance system "demonstrat[ed] a relative acceptance of his incarceration." Amicus Supp. App. 335. And although they acknowledged the seriousness of the escape attempts, they argued that prison records contemporaneous with the 1989 makeshift key incident "did not indicate that Mr. Wharton [posed] an imminent threat of escape." Dist. Ct. Dkt. No. 219, Ex. 13, at 3; *see also* App. 1411 ("[T]here was no indication that he tried to use the handcuff key[,] and he certainly had opportunity to do so.").

Contrary to that testimony, experts called by the OAG emphasized Wharton's "longstanding" "pattern of antisocial behavior" and expressed concerns about his "future intentions" given his escape attempts and "[h]is continued failure . . . to accept responsibility" for them. Amicus Supp. App. 24, 32 (cleaned up). They stated that the positive behaviors Wharton exhibited in his interactions with others were shallow and that his use of the grievance system "reflect[ed] a certain impulsivity" "because a lot of what he grieved could have been handled without a grievance." Amicus Supp. App. 39–40. The

10

OAG experts concluded that presenting evidence of Wharton's adjustment to prison would have made the jury more likely to sentence him to death.

E

After the evidentiary hearing, the District Court held that Wharton had not shown prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), from his counsel's failure to present evidence of positive prison adjustment. On appeal, Wharton makes two arguments: (1) the District Court erred in finding that he failed to establish prejudice; and (2) the case should "be remanded for a new hearing before a different judge" because the District Court's actions "created an appearance of unfairness and partiality." Wharton Br. 1.

II

The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. The District Court considered Wharton's *Strickland* claim de novo on remand because we had found that the Pennsylvania Supreme Court's application of *Strickland* in Wharton's post-conviction proceedings was unreasonable and not entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996. We review the District Court's legal conclusions de novo and its factual findings for clear error. *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 589 (3d Cir. 2015); *Lambert v. Blackwell*, 134 F.3d 506, 512 (3d Cir. 1997).

III

A

A petitioner claiming ineffective assistance of counsel must show that: (1) his lawyer's performance was unreasonable under "prevailing professional norms"; and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. Courts should, as we will here, "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" when it is the easier of the two issues. *Id.* at 697. A "reasonable probability" means one "sufficient to undermine confidence in the outcome" of the proceeding. *Id.* at 694. It is a lower standard than a preponderance of the evidence, but that distinction matters "only in the rarest case." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

When assessing whether the result of the proceeding would have been different, courts reweigh the aggravating factors "against the *totality* of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (emphasis added). This includes any rebuttal evidence the prosecution would have introduced, as well as any new evidence presented during the post-conviction review. *See Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011). In a capital case, the court must decide whether the new evidence "would have convinced [even] one juror" to find that the mitigating factors outweighed the aggravating factors. *See Blystone v. Horn*, 664 F.3d 397, 427 (3d Cir. 2011) (cleaned up). We agree with the District Court that there is not a "reasonable probability" that Wharton's prison records would have caused a juror to change his or her

sentencing vote given the compelling rebuttal evidence the prosecution would have presented.

1

Wharton's prison records show that he complied generally with prison behavioral standards, but he was disciplined multiple times for various infractions. His behavior improved over time, especially during the second half of his incarceration. He was non-violent during his incarceration on death row, but he shoved a deputy during his 1986 escape attempt while in county custody. Though Wharton sometimes demonstrated positive behaviors, such as his efforts to continue his education and expand GED testing access to capital inmates, the District Court did not clearly err in finding that most of "the behavior Wharton characterized as positive [was] the 'minimum' expectation" for inmates. *Wharton v. Vaughn*, 2022 WL 1488038, at *14 (E.D. Pa. May 11, 2022).

At the same time, the prison records contained strong evidence adverse to Wharton. The jurors would have learned that Wharton tried to escape shortly after his murder conviction and was caught with escape tools in his cell three years later. This serious misconduct would have suggested to jurors that life imprisonment was inadequate because Wharton posed a risk of future danger. The prosecution also could have framed Wharton's actions as evidence of ongoing manipulative behavior and his pattern of engaging in superficially positive behaviors while planning his next escape. In fact, the new evidence may have strengthened the prosecution's sentencing case because Wharton's repeated escape attempts undermined one of the defense's strongest arguments: that Wharton would die in prison if the jury gave him a life sentence. So while the prison records provide some evidence that Wharton was

13

reforming himself, his escape attempts during this same period negate any reasonable probability that a juror would have changed his or her vote during Wharton's resentencing hearing.

2

Expert testimony would not have altered this outcome. Experts on both sides acknowledged the severity of Wharton's escape attempts. Though Wharton's experts sought to portray his overall prison adjustment as positive, jurors would have been skeptical of their conclusions. For instance, it strains credulity to claim, as one defense expert did, that though Wharton crafted and concealed a makeshift handcuff key three years after his first escape attempt, the fact that he never used the key demonstrates "a positive adjustment to his confinement." App. 460. The same expert wrote in his report that Wharton "ha[d] not displayed any problematic behavior," Dist. Ct. Dkt. No. 219, Ex. 13, at 4, but then acknowledged on cross-examination that he ignored all of Wharton's prison misconduct in reaching this conclusion.

The DAO nevertheless argues that jurors may have found the defense experts more credible than the OAG's experts because one of the latter showed an "unwillingness to concede the positive aspects of [Wharton's] prison record." DAO Br. 31. Fair enough. But one of Wharton's experts expressed a similarly biased viewpoint by ignoring Wharton's misconduct when forming an opinion about his behavior in prison. The most likely result is that jurors would have distrusted the experts on both sides.

Even if jurors had credited the defense's expert testimony that rash behavior diminishes with age, they would

14

not likely have attributed Wharton's creation of a makeshift handcuff key to youthful impulsivity. Handcuff keys were uncommon and, as a corrections officer testified, Wharton's key was unusually well constructed. This testimony, coupled with Wharton's prior escape attempt and his concealment of the key, suggests Wharton was preparing for a second escape attempt, not acting on impulse. At best, expert testimony on the role of brain development might have led jurors to discount the significance of Wharton's less-serious prison misconduct from the early years of his incarceration. But there is no reasonable probability it would have changed the jurors' sentencing decision given Wharton's more serious misconduct.

B

Wharton and the DAO raise several other arguments on the ineffective assistance of counsel claim. None is persuasive.

First, Wharton asserts that the jury's deadlock note shows that this was a close case, making it more likely that evidence of his prison adjustment, if viewed as positive, would have swayed one juror. It is true that "the length of jury deliberations may be one consideration in assessing the strength of the prosecution's case," which can inform the likelihood that mitigating evidence could have affected the outcome. *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 805 (3d Cir. 2020). But the jurors declared themselves deadlocked after just over seven hours of deliberation, and they reached a verdict after about six additional hours of deliberation. The jury could not likely have worked through its disagreements so quickly had this truly been a deadlock. So the probative value of the deadlock note is minimal in view of the total length of deliberations.

15

Second, Wharton argues that there is a "reasonable probability" that evidence of his April 1986 county escape attempt "might not have been admitted at the resentencing trial" because it "does not necessarily rebut the evidence of his behavior once he was sent to *state* custody." Wharton Br. 36 (emphasis added). We reject this argument because: (1) his state prison intake form directly mentioned Wharton's 1986 escape attempt; and (2) the sentencing judge would not have excluded rebuttal evidence from just one month before Wharton's transition from county to state custody where doing so would have misled the jury about the mitigation evidence.

Third, Wharton contends that the District Court improperly relied on a subjective rather than objective view of the evidence. Wharton bases this argument mainly on the Court's use, in two instances, of the phrase "I agree with . . ." while describing testimony from OAG experts. Reading the Court's statements in context shows that such phrases were shorthand for crediting the evidence as persuasive and explaining how the Court believed jurors would view the evidence. This does not reflect a substantive analytical problem.

Finally, Wharton contends that the District Court erred by rejecting his proposed stipulation of testimony for one of his experts who was unavailable to testify. The District Court did so based on objections from the OAG, which the Court had appointed as amicus curiae. Consistent with its role as the evidentiary gatekeeper, a district court need not accept stipulations between parties. *See United States v. Barnes*, 602 F.3d 790, 796 (7th Cir. 2010); *see also* 83 C.J.S. Stipulations § 18. Because the adversarial process broke down after the DAO's about-face, the District Court had reason to be skeptical of a proposed stipulation that would have prevented cross-

16

examination of an expert and impaired the Court's ability to review evidence.

The DAO's arguments are unpersuasive as well. The DAO contends that the jury's question on whether it could consider mitigating evidence that occurred after the murders increases the likelihood that one juror would have changed his or her vote in response to Wharton's prison records. But this argument ignores the fact that the jury would have been presented with *all of* Wharton's post-conviction behavior, including his violent first escape attempt and his continuing efforts to escape years later, both of which would have outweighed his positive behaviors. The DAO also claims that the negative behavioral assessments by OAG experts were inaccurate because, contrary to their predictions, Wharton has been well-behaved since 1992. But the sentencing jury in 1992 would have known none of that when making its decision.

\* \* \*

For all of these reasons, the District Court did not err when it held that Wharton's ineffective assistance of counsel claim failed for want of prejudice.

IV

On top of his ineffective assistance of counsel claim, Wharton accuses the District Court of "creat[ing] an appearance of unfairness and partiality," Wharton Br. 47, by: (1) allowing an amicus curiae to participate extensively in the evidentiary hearing; (2) rejecting a stipulation involving one of Wharton's experts; (3) allowing the victims' family members to testify at the evidentiary hearing; (4) expressing frustration with the concession from the DAO on the merits of Wharton's

17

case; and (5) considering the imposition of sanctions against the DAO during the evidentiary hearing.

An appearance of impropriety exists if "a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *United States v. Kennedy*, 682 F.3d 244, 258 (3d Cir. 2012) (cleaned up). But "a party's displeasure with legal rulings does not form an adequate basis for recusal." *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 278 (3d Cir. 2000). After all, an adverse ruling is not by itself evidence of partiality or unfairness even if the ruling is erroneous. *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 330 (3d Cir. 2015). And "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Rather, evidence of bias normally stems from an "extrajudicial source" rather than "facts introduced or events occurring in the course of the current proceedings, or of prior proceedings." *Id.* None of the District Court's actions that Wharton identifies constitute evidence of partiality.

First, the OAG's "extraordinary level of participation in the hearing" as an amicus curiae did not create an appearance of partiality. Wharton Br. 52. Because the DAO yielded to Wharton after decades of opposition, the OAG's involvement was necessary for the Court both to account for the Commonwealth's interests and to make an informed ruling on the issues. *See Commonwealth v. Brown*, 196 A.3d 130, 146 (Pa. 2018) ("After trial and the entry of a capital verdict . . . [t]he community now has an interest in the verdict, which may . . . be disrupted only if a court finds legal error.").

18

Second, Wharton offers no extrajudicial evidence to support his claim that the District Court appeared to act with partiality by rejecting the stipulation involving testimony from a defense expert. Under *Securacomm*, Wharton must provide evidence of partiality that goes beyond mere disagreement with a legal ruling. But he failed to do so.

Third, federal law affords the families of murder victims "[t]he right to be reasonably heard at any public proceeding . . . involving . . . sentencing." 18 U.S.C. § 3771(a)(4). That right includes "[f]ederal habeas corpus proceeding[s] arising out of a State conviction." § 3771(b)(2)(A). The proceeding here involved sentencing because the DAO announced it would not seek the death penalty again, and the Court had questions about whether the DAO had obtained input from family members on this sentencing decision. The District Court also acknowledged that "the victims' family's testimony has no bearing on the merits of Wharton's Sixth Amendment claim," *Wharton*, 2022 WL 1488038, at *4 n.3, so we have no reason to believe that the District Court was improperly influenced by the family's testimony. After all, "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

Fourth, Wharton offers no examples of how "the [C]ourt appeared increasingly frustrated" with the DAO. Wharton Br. 55. Even if the District Court had expressed frustration, a reasonable person would understand it to be directed at the DAO rather than at Wharton or the merits of his case. The DAO abruptly changed course, without explanation, on a position it had staunchly defended for over 30 years. Moreover, under Pennsylvania Supreme Court precedent, the DAO lacked authority to concede relief on a jury-imposed

19

death sentence absent a finding of legal error. *Brown*, 196 A.3d at 144–46. So even had the District Court expressed frustration with the DAO, it would hardly make a reasonable person question the Court's impartiality.

Finally, Wharton argues that the Court "assumed the [conflicting] roles of both adjudicator and inquisitor" by evaluating his habeas petition while also considering the imposition of sanctions against the DAO. Reply Br. 20. Wharton says that these functions conflict "because a determination that the ineffective assistance claim had merit would demonstrate that the DAO had acted properly in conceding the merits of the claim." *Id.* at 19–20. Not so. The Court could have found for Wharton on his habeas petition while also concluding that the DAO, despite being correct on the merits, made misrepresentations to the Court.

Wharton tries to analogize his case to the situation in *In re Murchison*, 349 U.S. 133, 133–35 (1955), where a judge served as a "one-man grand jury" as permitted by state law and charged two of the grand jury witnesses with contempt. The same judge then improperly presided over the witnesses' public contempt trial and convicted both. *Id.* at 135. That case is inapt. While *Murchison* held that criminal trials cannot have the same accuser and adjudicator, it acknowledged that "contempt committed in a trial courtroom can under some circumstances be punished summarily by the trial judge." *Id.* at 137. The Court also said in *Murchison* that the judge could not be both the accuser and adjudicator in the *same* dispute. *See id.* But the DAO's conduct and Wharton's habeas petition are distinct issues; they are connected, but the outcome of one does not dictate the outcome of the other. Discussing both issues in the evidentiary hearing would not lead a reasonable person to question the judge's impartiality or fairness.

\*       \*       \*

For all of these reasons, the District Court did not create an appearance of unfairness or partiality.

V

Wharton cannot show that he suffered prejudice from his counsel's failure to offer his prison records as mitigation evidence at sentencing. If the jury had seen the prison records, there is not a reasonable probability one of the jurors would have found that the mitigation evidence in Wharton's case outweighed the aggravating factors such that his sentence would have been different. And Wharton's arguments that the District Court acted with an appearance of unfairness and partiality are unpersuasive because they are based on the District Court's legal rulings rather than evidence of unfairness or partiality. We will affirm.

21