**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1451

Charles Freeman

v.

Superintendent Fayette SCI; District Attorney Montgomery
County;
Attorney General Pennsylvania,

                                        Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 2-19-cv-04333)
District Judge: Hon. Eduardo C. Robreno
_____

Argued November 7, 2022

(Filed  March 17, 2023)

Before:  JORDAN, SCIRICA, RENDELL, *Circuit Judges*.

Robert M. Falin
Adrienne D. Jappe [ARGUED]

Montgomery County Office of District Attorney
P.O. Box 311
Norristown, PA 19404

Ronald Eisenberg
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

*Counsel for Appellants*

Joanne M. Heisey [ARGUED]
Federal Community Defender Office for the Eastern District of
Pennsylvania
Capital Habeas Unit
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA 19106

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RENDELL, *Circuit Judge*.

Appellants, the Attorney General of Pennsylvania, the District Attorney of Montgomery County, and the Superintendent of Fayette State Correctional Institute ("the Commonwealth"), urge us to reverse the federal District Court's order granting Appellee Charles Freeman a writ of habeas corpus. Freeman claimed that his constitutional right to

confrontation was violated when a Pennsylvania trial court allowed a codefendant's statement to be introduced at trial, with inadequate redactions. The District Court agreed, and because it concluded that the violation was not harmless error, it granted the writ. We agree that Freeman's constitutional rights were violated, but conclude that the error was harmless, and, therefore, we will reverse.

During the fifty-plus years since the Supreme Court, in *Bruton v. United States*, 391 U.S. 123 (1968), confronted the issue before us, lower courts have had plenty of time to grapple with the contours of when and in what manner it is acceptable for a non-testifying codefendant's statement to be introduced at a joint trial when other defendants are implicated in the statement. Yet this remains a thorny issue, since "[t]he Confrontation Clause of the Sixth Amendment . . . guarantees the right of a criminal defendant to be confronted with the witnesses against him." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (cleaned up). This includes "the right to cross-examine witnesses." *Id*. On the other hand, "[j]oint trials play a vital role in the criminal justice system," including by "enabling more accurate assessment of relative culpability," and "avoiding the scandal and inequity of inconsistent verdicts." *Id*. at 209-10.

Even when a court cautions the jury that the statement should be used only against the person who made it, and not against the codefendants, "[t]he fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors." *Bruton*, 391 U.S. at 129. It is difficult for a jury to "segregate evidence into separate intellectual boxes." *Id*. at 131 (internal quotation marks omitted).

3

The Supreme Court has given directives as to when and how such a statement may be used, in three cases: *Bruton*, *Richardson*, and *Gray v. Maryland*, 523 U.S. 185 (1998). While there are instances that test the limits of this jurisprudence, it is clear that when a statement is redacted—whether by substituting the codefendant's name with a neutral pronoun, a blank space, or a symbol—in such a manner that "[a] juror … need only lift his eyes to [the codefendant], sitting at counsel table" to understand who is being implicated in the statement, the introduction of that statement is a Sixth Amendment violation under *Bruton* and the cases that followed, and the admission of the statement is error. *Gray*, 523 U.S. at 193.

Here, we will keep those directives in mind as we consider the case of Charles Freeman, who in 2014 was convicted at trial, along with two codefendants, of second-degree murder. The jury had heard the confession of Omar Miller, one of Freeman's non-testifying codefendants, with redactions that replaced the names of the other codefendants, Andre Collier and Freeman, with the substitutes "the first guy" and "the second guy," respectively. The Court gave a limiting instruction that the statement was to be considered only as to Omar Miller, not as to the other defendants, in order to protect Freeman's Sixth Amendment right to confront a witness against him. Freeman objected during trial to the use of the confession but was overruled. On appeal in state court, Freeman again raised his *Bruton* claim, but was unsuccessful. After exhausting state direct appeals and post-conviction relief, Freeman sought habeas relief in federal district court under 28 U.S.C. § 2254. The District Court concluded that a *Bruton* violation occurred and that the violation was not harmless, and granted Freeman's habeas petition.

4

We agree with the District Court that a *Bruton* violation occurred. However, because there was ample other evidence against Freeman, and the violative statement was largely duplicative of other evidence, we do not have "grave doubt about whether [the error] had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (cleaned up). We conclude that the error was harmless and therefore, we will reverse.

## I.   The Trial

In April 2014, Charles Freeman, Omar Miller, and Andre Collier were tried for the robbery, kidnapping, and murder of Kareem Borowy on May 5, 2013. A fourth man, Rasheed Teel, had already pleaded guilty, and agreed to testify against his coconspirators. The trial lasted four days (not including jury selection).

During opening statements, counsel for all parties made clear that Rasheed Teel's testimony against the three defendants would be of extreme importance. The prosecution warned the jury that the defendants would try to attack Teel's credibility, since he had obtained a plea deal in exchange for his testimony. Indeed, Freeman's lawyer offered a cautionary note: "[T]he Commonwealth's foundation, the foundation of their case is Rasheed Teel." App. at 651. "Remember," he urged, with a mnemonic, "Teel tells tales." App. at 652. Clearly, both sides understood the potential impact, and importance, of Teel's testimony.

On the stand, Teel testified that he, together with Freeman, Miller, and Collier, had planned and carried out the robbery of Kareem Borowy. They, led by Freeman and Collier,

5

met around noon on Sunday on the back porch of a house on King Street in Pottstown, Pennsylvania, and planned what they called a "mission." App. at 744-46. They left together and, according to Teel, Freeman drove the men to Borowy's house in Freeman's Buick LeSabre. While Freeman waited in the car, Collier, who had a gun, Teel, and Miller entered Borowy's. They came upon two houseguests, tied them up, and ransacked Borowy's room. They retrieved some money, but Collier was not satisfied with the take: he demanded more. Borowy told the men he had another place, a stash house, where they could get more money. So Collier called Freeman, who picked them up, and they put Borowy, whom they had tied up with packing tape, in the backseat of Freeman's car, between Collier and Miller. Teel sat in the front passenger seat. The five of them drove around for a while, but they never did find the stash house. At one point, the car slowed down. Borowy managed to get his hands free and escape from the car. Collier jumped out after him, fired two shots, and got back in the car. Collier told the others he saw Borowy fall. Then Freeman dropped them off at the King Street house. The robbery netted $1,800.[1]

Teel was cross-examined extensively. Miller's counsel pointed out that in earlier statements to the police, Teel had not mentioned Miller's involvement at all, but later changed his story. Collier's counsel cross-examined Teel about prior inconsistent statements, including his initial denial of any involvement whatsoever in the robbery and killing when questioned by police on May 9. Collier's counsel questioned Teel about how his story changed as the questioning from police went on longer and longer. At first, he denied knowing

---

[1] When Freeman was arrested two weeks after the murder, he had $800 cash on his person.

anything about the robbery and murder. Then, in a statement later that evening, he told police that Freeman and Collier were involved, and later still, he told them that a fourth person had been involved. In fact, Teel never implicated Miller until he testified at trial. Defense counsel also impeached Teel's credibility by questioning his motivations for "testifying and getting the best deal you can." App. at 773. Teel confirmed that in order to reduce the charge from murder, which would have resulted in a mandatory life sentence, to a third-degree murder charge, he agreed to testify at trial.

Three other witnesses testified that they were in the King Street house on the Sunday of the robbery, and they saw the four men all talking together behind the house early in the afternoon, around 1:00 p.m. or 1:30 p.m., just before the robbery, though they could not hear what the men said. Two of the witnesses testified that the four men left the house together, or at least at the same time.

A police officer testified that when he arrived at the side of the road where Borowy lay, around 2:29 p.m., the victim was unresponsive, with no pulse, no "signs of life." App. at 733. The jury also heard from the county coroner, who testified that Borowy died from a gunshot wound to his back, and that it likely took about five to ten minutes for Borowy to bleed out and die, though possibly longer. The prosecution would later put the shooting at 2:14 p.m.

The jury also heard from Lewis Scott, one of the guests in Borowy's home on that day, who testified that the intruders led him from the upstairs bedroom down to the kitchen, at gunpoint, where he saw Borowy and the other guest lying on the kitchen floor, tied up. They tied Scott up, too, and took Borowy upstairs for a while, looking for money. Scott heard

7

one of the intruders say, "ride is here," then they led Borowy out the back door, and they were gone. App. at 706. The second houseguest that day, Jeffrey Boyer, was also tied up at gunpoint—"hog-tied in the kitchen," as the prosecution put it, with a piece of tape over his mouth. App. at 939. Boyer testified that he, too, heard one of the men say, "the ride's here; let's go; the ride's here." App. at 944. The guests who had been tied up escaped shortly after the robbers left the house with Borowy, and they went to a neighbor, who called the police. That call occurred at 2:01 p.m.

There was extensive testimony about Freeman's car. Garrison Brown, Freeman's cousin who owned a mechanic's shop, testified that on the morning of the murder, Freeman called and told him he needed to bring his car in to the garage because it was overheating, and that Freeman brought it in that day or the next day. Bramwell Davis, a mechanic who worked at Brown's garage, testified that Freeman called him on Friday, May 10—the same day police spoke with Freeman about the murder—and inquired about getting his car back immediately. But in the end, Freeman could not pick the car up that night; Davis could not find the keys. Instead, Freeman came back the next morning, May 11.

Brown also testified that on May 11, Freeman inquired about getting the interior of the car cleaned—but not the exterior. A man named Brimstone, who would clean cars cheaply but was not a regular employee of the garage, agreed to do it for ten dollars. Freeman left the car to get cleaned and detailed. Brown went home to take his insulin; when Brown returned, police were there, examining the car.

Detective Paul Michael Bradbury, from the Montgomery County District Attorney's Office, was one of the

8

officers who was there when Brown returned. Detective Bradbury said that, when he went to pick up Freeman's car from the garage, the inside was being cleaned with soapy water and chemical solvent. Photographs of the wet interior were offered into evidence, and Bradbury testified that the backseat was still wet from soapy water and chemical spray.

On the other hand, the jury also heard from Freeman's girlfriend, Janae Nixon, who testified that Freeman regularly bought and sold cars, and so getting it cleaned would not have been unusual. Nixon said that, in fact, Freeman told her the morning of May 5 (the day of the murder) that he planned to get the car cleaned.

Nixon also testified that on May 10, five days after the murder, when she came to the door to speak with detectives who had come to interview Freeman, the police told her they were trying to locate Freeman's phones. Nixon testified she'd seen them charging in the living room just a few moments before the police came, but when the police asked if she'd call one of his phones, it rang from inside a trash can, where both phones were discovered. Freeman claimed he tossed his phones away because he was a drug dealer, not a murderer.

Joseph Coffman, a forensic investigator in the local police department, provided expert testimony regarding cell phone logs and cell-site information. Coffman told the jury that there were cell phone communications between Freeman and Collier leading up to and during the crime, and cell phone tower data putting Freeman within the range of both King Street and the murder scene during the relevant time periods. On cross-examination, Coffman said that "close proximity" could mean within a radius of two miles or more. Thus, it was

9

possible Freeman was merely in the area, but not at the location of the crime.

Detective Mark Minzola testified that on May 5, there were numerous phone calls between Freeman's cell phone and Collier's cell phone between 1:07 p.m. and 4:39 p.m. Those calls include: At 1:07 p.m., Collier called Freeman; the call lasted nineteen seconds. Moments later, Freeman called Collier's phone. That call lasted ten seconds. Again, at 1:07 p.m., Freeman called Collier; this time the call lasted fifty-two seconds. At 1:26 p.m., Collier called Freeman, for eleven seconds. At 1:50 p.m., Collier called Freeman for nineteen seconds. At 1:52 p.m., Freeman called Collier for twenty seconds. At 1:54 p.m., Freeman called Collier for thirty-seven seconds.

The prosecution posited the time of shooting at 2:14 p.m., which would place these phone calls directly before the murder, i.e., during the robbery, when Collier purportedly called Freeman to pick them up, and afterward, after the group had dispersed, and Borowy was already dead. There was a 911 call at 2:01 p.m., made by a neighbor of Kareem Borowy's, after the two houseguests freed themselves and made it to the house next door. A passerby also made a 911 call reporting a Black male (Borowy) lying on the side of the road, yelling for help, at 2:26 p.m.

Through Freeman did not take the stand, Detective Minzola read from a statement that Freeman gave to the police, in which Freeman claimed to have been in Pottstown with a woman he called Tay during the day of the robbery, and that afterward he drove to a Wawa convenience store. There was video evidence of Freeman at the Wawa at 2:28 p.m.

Also on the fourth day of trial, the jury finally heard the statement that is at the center of this appeal. Freeman's codefendant Miller had previously given a statement to the police. That statement was introduced and then read by Detective Todd Richards.[2] The statement had been redacted so that all references to Collier and Freeman by name were replaced with "the first guy" and "the second guy," and references to Freeman's Buick LeSabre were redacted to "car." App. at 1335. References to Rasheed Teel remained, however, so that the three men were referred to in the statement as Rasheed, "the first guy" (Collier), and "the second guy" (Freeman), with Miller referring to himself in the first person.

The jury was instructed that the statement was to be used only as evidence against Miller, and the Court repeated this cautionary instruction at the end of the trial.[3]

---

[2] Prior to and during trial, Freeman filed motions to sever on Sixth Amendment grounds, arguing that his codefendant's statements were not capable of separation by the jury, and later, that they could not be sufficiently redacted to avoid undue prejudice to him. The trial court denied the motion to sever and permitted the prosecution to use Miller's statement.

[3] After Miller's statement was read, the Court cautioned:

> Ladies and gentlemen of the jury, before we take our first break of the morning, I just want to give you a cautionary instruction about what you just heard. Omar Miller's statement, which is what the Detective just testified to, is to be considered by you only as to Omar Miller's involvement in this case, along

11

Some of the statements which relate directly to Freeman's involvement, and which the jury heard Detective Richards read aloud, are as follows:

> Q: Did anyone else come to 553 King Street after you were there?
>
> A: Yes. The second guy did.
>
> Q: While you were at 553 King Street, did you hear conversations about this robbery being planned?

---

> with the other evidence in this case. It is not to be considered by you against anyone else.

App. at 1331.

At the end of the trial, the Court again instructed the jurors:

> Now, as you recall, you heard testimony about Defendant Omar Miller giving a statement that was admitted into evidence. Defendant Miller's statement is to be used by you only with respect to Defendant Miller in your consideration of his involvement along with all the other evidence in this case. Defendant Miller's statement is not to be considered by you with respect to anyone else.

App. at 1702-03.

12

A: They wasn't saying robbery. They was talking about they got a **mission**.

Q: What does "a mission" mean to you?

A: Robbery.

App. at 1315 (emphasis added).

Q: Were you present during the robbery at 1255 Manatawny Street?

A: Yes. It wasn't supposed to be no robbery. **The first guy** was supposed to go there to buy a few pounds of weed.

Q: Who else went there?

A: Rasheed Teel, me, **the first guy**, and **the second guy** was driving.

Q: When you went to 1225 Manatawny street, where was everyone seated?

A: **The second guy** was driving. **The first guy** was in the front passenger seat. I was in the back passenger side, and Rasheed was in the back driver's side.

Q: What car were you in?

A: **The second guy's** car.

App. at 1323 (emphasis added).

13

Q: Where was everyone seated in the car when you left 1255 Manatawny Street?

A: **The second guy** was driving. Rasheed was in the front passenger seat. I was in the back passenger side seat. **The first guy** put the boy in the middle, and then he was in the back seat behind the driver.

Q: Did you see how **the first guy** shot him?

A: He was running with his right hand out, shooting with one hand.

Q: What happened after the shots were fired?

A: **The first guy** ran back to the car and jumped in and said, drive. I didn't see the boy after that.

Q: What happened when **the first guy** got back into the car?

A: [. . .] He put the gun up to **the second guy's** neck and told him to drive.

App. at 1326-27 (emphasis added).

Q; When you were inside of 1255 Manatawny Street, who called **the second guy** to come pick you back up?

A: The first guy.

14

App. at 1329 (emphasis added).

On the final days of trial, both sides worked to establish a timeline. Detective Minzola of the Montgomery County Police Department testified that the murder occurred at approximately 2:14 p.m. The jury saw video footage of Freeman exiting an empty car at a Wawa on High Street in Pottstown at 2:28. At some point between the shooting and Freeman's arrival at the Wawa, Freeman, the prosecution alleged, dropped the other three men off at the King Street residence.

The prosecution's witness testified that driving from Sanatoga Station Road to King Street could take as little as eight minutes, a defense witness testified that it took him approximately twelve minutes to complete the drive from Sanatoga Station Road to King Street to the High Street Wawa, but conceded that it "certainly" could be done in eight and a half minutes.

Freeman offered a different timeline of events than the Commonwealth, placing the shooting at 2:21 p.m. According to that theory, based on the time of death, Borowy died, at most, eight minutes after being shot. Under Freeman's timeline, he would not have had time to participate in the murder, drive his coconspirators back to the King Street house, and then go to the Wawa when he did.

There was also evidence regarding Freeman's financial situation. He told his cousin he was broke the day before the murder, but he paid cash when he took his girlfriend out to dinner the night of the murder. But he didn't have a credit card and always paid cash. Two weeks after the murder, he had $800 on his person when he was arrested.

15

In closing argument, Freeman's counsel urged that Rasheed Teel was not credible, and pointed out the perceived weaknesses of the prosecution's case. "Rasheed Teel is a reasonable doubt," counsel urged. App. at 1602. "[Y]ou cannot convict based on his testimony." App. at 1603. The prosecution, on the other hand, urged otherwise, pointing out that both Teel and Miller had used the word "mission" to describe the robbery, and urging the jury that when Teel was "attacked" on cross-examination, App. at 1656, "the one thing he never wavered on was that Omar Miller, Andre Collier, Charles Freeman, they were all part and parcel to everything that happened, the robbery, the kidnapping and the shooting." App. at 1657. The prosecution summed up the case against Freeman relying heavily on Teel's testimony and other circumstantial evidence, including the situation with Freeman's car, him suddenly having cash, and him tossing the cell phones in the trash. Faithful to the Court's instruction, the prosecution never referred to Miller's statement when it was summarizing the case against Freeman.

The judge gave instructions at 2:43 p.m. on the final day of trial. At 3:45 p.m., the jury retired to deliberate. At 4:45 p.m., the jury was back in the courtroom with a question regarding the definitions of conspiracy and kidnapping. At 6:51 p.m., the court announced that the jury had reached a verdict. Freeman, Miller, and Collier were found guilty of second-degree murder.

## II.    Procedural History

After Freeman was convicted by a jury in the Court of Common Pleas of Montgomery County, he appealed to the Pennsylvania Superior Court, raising, among other issues, the alleged *Bruton* violation. The Superior Court affirmed

16

Freeman's conviction, concluding that there was no *Bruton* violation. Specifically, the court relied on *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001) and *Commonwealth v. Cannon*, 22 A.3d 210 (Pa. 2011), for the proposition that "substituting the neutral phrase 'the guy' or 'the other guy' for the defendant's name is an appropriate redaction." *Commonwealth v. Freeman*, 128 A.3d 1231, 1245 (Pa. Super. Ct. 2015). After exhausting his appeals and his post-conviction relief at the state level, Freeman filed a petition for a writ of habeas corpus in federal district court. The District Court referred the case to a magistrate judge, who issued a Report and Recommendation concluding that Freeman's *Bruton* claim was meritorious in that the admission of Miller's statement had indeed violated the Confrontation Clause, but that other evidence rendered the error harmless.

The District Court adopted the Magistrate's Report and Recommendation insofar as the *Bruton* violation was concerned but rejected the report's harmless error analysis. *Freeman v. Capozza*, 517 F. Supp. 3d 407 (E.D. Pa. 2021).

In deciding that the error was harmful, the District Court expressed doubts "that the evidence of Freeman's guilt, apart from Miller's statements, overwhelmingly suggests that the *Bruton* violation was harmless," and that "a fair amount of the evidence against Freeman permits equally an inference of guilt as it does a more benign explanation." *Id.* at 410-11 (cleaned up).

For example, the Court reasoned it was possible that Freeman's cell phone data showed he was within two miles of the robbery and murder simply because he frequented the area, and not necessarily because he was participating in the crimes. *Id.* at 411. Likewise, the phone calls between Collier and

17

Freeman "could give rise to a benign explanation, given that Freeman and Collier were close friends." *Id*. The three witnesses who testified about seeing Freeman with the other three men on the back porch at King Street did not actually *hear* the conversation the men were having, and so "their testimony is not so definitive." *Id*. Finally, the Court pointed to inconsistencies in Teel's testimony, both in regard to prior statements he had given to the police and the testimony of Lewis Scott. (Scott said that Teel had a gun; Teel claimed he did not). *Id.* at 412. In the end, the Court concluded that the "evidence is consistent with both guilt and the absence of guilt." *Id*. at 414.

Based on this reasoning, the District Court concluded that the admission of Miller's statement was not harmless error and granted Freeman a writ of habeas corpus. *Id.* The Commonwealth timely appealed.[4]

## III. **Bruton Violation**

### A. Standard of review

We review the District Court's *Bruton* analysis de novo. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010). But on habeas review, an erroneous ruling by the state court is not enough to cause us to grant habeas relief. This is because those aspects of Freeman's claim that were adjudicated on the merits in state court are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, we "afford considerable deference to state courts' legal and factual

---

[4] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

18

determinations." *Id.* 391–92 (quoting *Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004)), and must affirm the state court proceedings "unless we are satisfied that [the habeas petitioner] has demonstrated that . . . the highest-level state court to review the admission into evidence of [the allegedly offending] statement on the merits, made a determination that 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Vazquez v. Wilson*, 550 F.3d 270, 276 (3d Cir. 2008) (quoting 28 U.S.C. § 2254(d)(1)).

"[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (cleaned up). AEDPA requires a petitioner to show "that the state court's decision to reject his claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Davis v. Ayala*, 576 U.S. 257, 269–70 (2015) (cleaned up). Accordingly, we must first determine whether there was a *Bruton* error. If so, we then proceed to test the state court's reasoning against the AEDPA standard.[5]

---

[5] The District Court concluded its *Bruton* analysis without the further step of examining the Pennsylvania Superior Court's determination under AEDPA, and so we examine it here ab initio.

19

B. Supreme Court and Circuit Precedent

*Bruton*, *Richardson*, and *Gray*, as we mentioned above, are the triad of cases that govern whether the admission of a statement violates the Sixth Amendment Confrontation Clause.

In *Bruton*, a joint trial of Bruton and a codefendant named Evans resulted in guilty verdicts for both men on an armed robbery charge. At trial, Evans's oral confession that he and Bruton committed the robbery was recounted by a postal inspector, with instructions from the court to the jury that the confession was not to be considered as to Bruton, only as to Evans. 391 U.S. at 124-25. The Supreme Court held that, "despite instructions" to the jury regarding the limitations of the evidence, "admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126.

In *Richardson*, the Court dealt with a set of facts "outside the narrow exception" it created in *Bruton*. 481 U.S. at 208. Defendants Marsh, Martin, and Williams were tried jointly for murder and assault. *Id.* at 202. Martin was a fugitive at the time of the trial. *Id.* Williams's confession was introduced at trial, over Marsh's objection. *Id* at 203. All references to Marsh had been completely redacted from the confession, however, *id.*, leaving reference only to Williams and Martin, the absent coconspirator. *Id.* at 203 n.1. The Court instructed the jury "not to use [the confession] in any way against" Marsh. *Id.* at 204. The Court held that such a confession "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* at 208. The Court reasoned that where a statement does not facially incriminate, and inferential steps are required to

20

connect the coconspirator's statement with his codefendant, then "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence" against the codefendant. *Id*. Thus, the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is *redacted to eliminate not only the defendant's name, but any reference to his or her existence*." *Id*. at 211 (emphasis added).

Finally, in *Gray*, two men, Bell and Gray, were tried jointly for murder. 523 U.S. at 188. Bell's confession to the crime, which implicated both Gray and a third coconspirator who had died by the time of trial, was read into evidence. *Id*. When the police detective read Bell's confession at trial, he replaced the deceased co-conspirator's and Gray's names with the words "deleted" or "deletion." *Id*. After the detective finished reading the confession into evidence, the prosecution asked, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" *Id.* at 188-89. The officer responded, "That's correct." *Id*. at 189. Faced with the question of whether a confession that did not facially refer to the codefendant by name, yet still referred to his existence, fell within *Bruton*'s protection, the Court held it did, reasoning that, "even when the State does not blatantly link the defendant to the deleted name," "an obvious blank will not likely fool anyone." *Id*. at 193. Referencing a simplified hypothetical confession that says "I, Bob Smith, along with Sam Jones, robbed the bank," the Court reasoned that

> [a] juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to Jones, sitting at counsel table, to find what

21

> will seem the obvious answer, at least if
> the juror hears the judge's instruction not
> to consider the confession as evidence
> against Jones, for that instruction will
> provide an obvious reason for the blank."
> *Id*. at 193. Some redactions may be
> "devices . . . so obvious as perhaps to
> emphasize the identity of those they
> purported to conceal.

*Id*. at 194 (quoting *Malinski v. New York*, 324 U.S. 401, 430 (1945) (Rutledge, J., dissenting).

## C. The Present Case

The *Bruton* analysis here turns on two differing views regarding the impact of *Richardson* and *Gray*. The Commonwealth argues that the use of "the first guy" and "the second guy" did not facially incriminate Freeman, since these substitutes neither referred to him by name, nor were they an "obvious indication of a deletion or an alteration that was the functional equivalent of naming him." Appellants' Br. at 42. Any implication of Freeman by Miller's statement could only have been done by the jurors inferentially, which, the Commonwealth urges, *Richardson* expressly rejected as a Confrontation Clause violation. On the other hand, Freeman says that the substitutions were so obvious, they offered insufficient protection based on *Gray*. Miller's statement was "directly accusatory." Appellee's Br. at 25. It named two perpetrators, and left two perpetrators unnamed, as "the first guy" and "the second guy." Freeman urges that this made it so that "the jurors needed only to lift their eyes to know that the statement referred to Collier and Freeman." Appellee's Br. at

22

29 (cleaned up) (citing *Washington v. Sec'y Pa. Dep't of Corr.*, 801 F.3d 160, 166 (3d Cir. 2015)).

The Commonwealth essentially urged that the Pennsylvania Superior Court's analysis was sound. The Superior Court had reasoned that the phrases "the first guy" and "the second guy," coupled with the limiting instructions provided to the jury, were within the bounds of established U.S. Supreme Court precedent under *Bruton* and its progeny. *Commonwealth v. Freeman*, 128 A.3d at 1245-46. Specifically, the Superior Court looked to *Travers* and *Cannon*, both of which concluded that "substituting the neutral phrase 'the guy' or 'the other guy' for the defendant's name is an appropriate redaction." *Id.* at 1245. The *Travers* and *Cannon* courts, in reaching their holdings, discussed the *Bruton* trio. *See* 768 A.2d at 847–51; 22 A.3d 210, 217–220. The Superior Court noted that while Freeman emphasized the frequency of the phrase "the second guy," "Freeman does not cite any legal authority to support his contention," 128 A.3d at 1245, and that, in light of U.S. Supreme Court and Pennsylvania Supreme Court precedent, "combined with the trial court's cautionary instruction," Freeman's Sixth Amendment right to confrontation was not violated. *Id.* at 1246. The Court relied on its view of *Richardson* but did not refer to *Gray*. *See id.*

We have had occasion to question the Pennsylvania Superior Court's reasoning in more than one precedential opinion, but one that is strikingly on all fours with the present case is especially noteworthy. In *Washington*, four men

23

committed robbery and murder.[6] *Washington v. Sec'y Pa. Dep't of Corr.*, 801 F.3d 471 160 (3d Cir. 2015). One of the men, Taylor, accepted a plea deal and testified against the remaining three coconspirators, Johnson, Washington, and Waddy, at their joint trial. 801 F.3d at 162. Taylor named Washington as the driver. *Id*. Co-defendant, Waddy, had given a statement to the police. *Id*. A detective read that statement into evidence at the trial, with Johnson's and Washington's names replaced with "the guy who went into the store" and "the driver," respectively. *Id*. at 163. The Court gave limiting instructions, and the jury found Washington guilty. We concluded that these redactions were plainly "transparent to the jurors" and were "in violation of the clear Confrontation Clause precepts laid out in *Bruton*, *Richardson*, and *Gray*." *Id*. at 167. Not only did we hold that the Pennsylvania trial court had committed a *Bruton* error, but we also criticized the Superior Court for adopting what we considered an untenable rule:

> The Superior Court applied a blanket rule, derived from *Commonwealth v. Travers*, that any redaction that would require a juror to consider an additional piece of information outside the confession in order to identify the coconspirator being referred to automatically falls inside the realm of *Richardson*. This is not a reasonable view of the law and would permit the admission of many facially incriminating confessions, in direct

---

[6] *See also Johnson v. Superintendent Fayette SCI*, 949 F.3d 791 (3d Cir. 2020); *Vazquez*, 550 F.3d 270.

contradiction of the rules clearly established in the *Bruton/Richardson/Gray* trilogy. For instance, *Gray* expressly instructs that the redaction cannot use descriptive terms, cannot replace the defendant's name with any kind of symbol, and cannot replace the defendant's name with an obvious indication of deletion[.]

*Id.* at 166-67 (citations omitted).

This case is eerily similar to *Washington*. Here, there were four men who committed the murder. Teel testified, and Miller's statement referred to Teel by name, and to "the first guy" and "the second guy" over and over again. Meanwhile, there were two defendants at the counsel table sitting next to Miller: Freeman and Collier. The substitutions were a device which likely fooled no one, a device which ultimately "point[ed] directly to the defendant[s], and it accuse[d] the defendant[s] in a manner similar to . . . a testifying codefendant's accusatory finger." *Gray*, 523 U.S. at 194. As in *Washington*, there was no mystery about whose names were being replaced. The District Court got it exactly right in adopting the Magistrate Judge's recommendation, and holding that "Freeman was clearly inculpated by Miller's statements" in a way that violated *Bruton* and its progeny. 517 F. Supp. 3d at 410. For these reasons, we agree with the District Court—and disagree with the Pennsylvania Superior Court—in concluding that the use of Omar Miller's statement at joint trial, as redacted, was a violation of Freeman's Sixth Amendment right to confront a witness.

25

But that does not end our inquiry, because, as we have noted, reviewing deferentially under AEDPA, we need to determine whether the Pennsylvania Superior Court's ruling constituted an unreasonable application of U.S. Supreme Court precedent. *Vazquez*, 550 F.3d at 276 (quoting 28 U.S.C. § 2254(d)(1)). Here again, *Washington* is instructive, as are our two other precedents that involved habeas appeals from Pennsylvania trial courts based on *Bruton* violations. In *Washington*, we specifically held that the "blanket rule" from *Travers*—so long as a statement does not facially identify a codefendant, it does not run afoul of *Bruton*—"is not a reasonable view of the law" and was "in direct contradiction of the rules clearly established in the *Bruton/Richardson/Gray* trilogy." 726 F.3d at 166. In the other two cases*, Johnson v. Superintendent Fayette SCI*, 949 F.3d 791 (3d Cir. 2020), and *Vazquez,* each of which involved habeas appeals from the Pennsylvania Superior Court that relied on *Travers*, we reached the same result based on similar reasoning.[7] These

---

[7] In *Johnson*, we concluded that the Pennsylvania court unreasonably interpreted *Bruton*, *Richardson*, and *Gray* under 28 U.S.C. § 2254(d)(1). The trial court had admitted a statement which used "the other guy" as a substitute, and "left little doubt that the only other accused sitting at the table with [the defendant who made the statement] was 'the other guy.'" 949 F.3d at 797. Similarly, in *Vazquez,* we found it "an unreasonable application 'of clearly established Federal law under the decision of the Supreme Court of the United States' to hold that [terms like 'the other guy'] always will be sufficient" to satisfy *Bruton*. 550 F.3d at 282. We note that as recently as 2021, in *Commonwealth v. Abdul-Hakim*, 253 A.3d 275 (Pa. Super. Ct. 2021), a Pennsylvania Superior Court,

cases are essentially indistinguishable from the case at hand, and we can easily conclude that the Pennsylvania Superior Court's application of *Bruton* and its progeny was unreasonable.

---

apparently unaware of our prior rulings on the matter, affirmed a lower court which reasoned:

> Our Pennsylvania courts have further clarified the law, that a non-testifying codefendant's statement in which the defendant's name is replaced with "the other guy" or a similar term does not violate *Bruton* when combined with an instruction advising the jury that they may only consider the statement against the defendant who made the statement. *Commonwealth v. Cannon*, 610 Pa. 494, 22 A.3d 210, 218 (2011); *Commonwealth v. Miller*, 572 Pa. 623, 819 A.2d 504, 511-513 (2002); *Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 138 (2001); *Commonwealth v. Travers*, 564 Pa. 362, 768 A.2d 845, 850-51 (2001).

*Commonwealth v. Abdul-Hakim*, No. CP-51-CR-0008181-2011 2020 (Philadelphia Ct. Com. Pl., 2020).

It is unfortunate and an unnecessary draw on judicial resources that Pennsylvania courts continue to abide by a rule which we have repeatedly held is an unreasonable application of clearly established U.S. Supreme Court precedent.

27

## IV.    Harmless Error Analysis

### A. Standard of review

Having found that a *Bruton* violation occurred and that the AEDPA standard has been satisfied, the next step is to determine whether the violation was nevertheless harmless error. *Johnson*, 949 F.3d at 798. Since the Pennsylvania Superior Court denied relief without addressing harmlessness, the District Court conducted its harmless error review de novo, and we do so as well. *See id*. at 799. In *Chapman v. California*, the Supreme Court held that when a defendant establishes the occurrence of a constitutional error at trial, a conviction cannot stand unless the government proves "beyond a reasonable doubt" that the error was harmless. 386 U.S. 18, 24 (1967). But in *Brecht v. Abrahamson*, noting that the standard should be more deferential to the government on AEDPA review, the Court flipped the burden so that the prisoner seeking federal habeas relief must show that the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 638 (1993). In other words, in a habeas proceeding, instead of the government having to prove no error, the defendant must prove substantial and injurious effect or influence on the outcome. *See id.*

The U.S. Supreme Court has instructed that the reviewing court is to consider five non-exclusive factors when making a harmless error determination:

> [1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and, of course, [5] the overall strength of the prosecution's case.

*Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

B. *Van Arsdall* factors

The Commonwealth argues that the only factor weighing against harmless error is the fourth factor, the extent of cross-examination, since Miller did not testify at trial. Freeman disagrees, arguing that the first factor favors him because Miller's statement was extremely important, since "[o]utside of Miller's statement, the only evidence directly implicating Freeman came from the testimony of his codefendant Teel." Appellee's Br. at 36. Miller's statement was introduced on the fourth day of trial. The jury had already heard testimony from coconspirator Teel that Freeman was involved, as the driver of the car and practically every step of the way. Miller offered little that Teel had not already recounted in his live testimony. And while Teel was subjected to cross-examination that exposed some inconsistencies in his story, "the one thing he never wavered on was that Omar

29

Miller, Andre Collier, Charles Freeman, they were all part and parcel to everything that happened, the robbery, the kidnapping and the shooting," as the prosecution urged in closing argument. App. at 1657.

There were three witnesses who testified they saw Freeman, along with the other three defendants, at the King Street house on the day of the murder, as well. In addition, cell phone data put Freeman in frequent contact with Collier at and around the time of the robbery, and the jury heard that Freeman's car was being given a thorough cleaning after the murder. Miller's statement—including its introduction, the trial court's limiting instructions to the jury, and the discussion by the opposing parties and the court immediately following Detective Todd's reading of the confession near the end of trial—occupies 38 pages out of a 1158-page transcript, or just over 3% of the total volume. While not insignificant, it would be a stretch to say that Miller's statement was pivotal evidence in the prosecution's case.

The second factor inquires whether the testimony was cumulative. It was, so that factor weighs in favor of harmlessness. Rasheed Teel had already testified to Freeman's participation on that day, and three other witnesses said Freeman was at the King Street house, where the men met before the robbery to discuss the "mission," and left together right before the robbery occurred.

As to the third factor, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, Teel's and Miller's statements were in agreement on the two most important points—Freeman's role in planning the robbery earlier that day, on King Street, and Freeman's role as the driver of the vehicle during the

30

robbery and murder. Freeman argues that Teel's testimony was not corroborative of Miller's confession, pointing to the District Court's finding that Teel suffered from "significant bias/credibility issues." Appellee's Br. at 36. While it is true, as Freeman points out, that Teel gave several statements, each succeeding version revealing more and more about the crimes, and that he contradicted prior statements when testifying before the jury, we believe that, in the end, the jury had good reason to accept that Teel told the truth as regards Freeman. After all, he was subject to vigorous cross-examination, including regarding the plea deal which Freeman argues impeached his credibility, as well as the way his story evolved, from initial blanket denial of involvement to the final iteration he attested to at trial.

The fourth factor, the extent of cross examination otherwise permitted, weighs against a finding of harmlessness, as the Commonwealth concedes. There was no cross-examination of Miller.

As to the fifth factor, the overall strength of the prosecution's case, the volume of evidence pointing to Freeman's participation, albeit circumstantial, was impossible to ignore, was damning, and would have been convincing even absent Miller's statement. Freeman was linked to the other coconspirators by three witnesses who each testified that the four men were all talking together behind the house on King Street just before the robbery. Two of the witnesses testified that the four men left the house together, as well. Cell phone logs and cell-site information corroborate Miller's testimony, too, as detailed above. Freeman's and Collier's phones shared several short calls between them at precisely the time that Collier was in Borowy's house, when he would have called for the ride from Freeman.

And the jury heard more: for instance, they heard about Freeman tossing his cell phones in the trash, getting the interior his car cleaned after being interviewed by police, and how the backseat was still wet from soapy water and chemical spray when the police picked up the vehicle from the garage.

Admittedly Freeman, at trial and on appeal, offered a different version of events: He tossed his phones away because he was a drug dealer, not a murderer; his car was legitimately overheating and in need of repair; and he regularly bought and sold cars, so getting this one cleaned was routine behavior. But, given the other evidence pointing to Freeman's guilt, the jury could readily reject these explanations proffered by the defense.

Freeman also offered a different timeline of events than the Commonwealth, and under Freeman's timeline, he would not have had time to participate in the murder, drive his coconspirators back to the King Street house, and then get to the Wawa, where he was caught on video, a few miles away. But the prosecution challenged that as well, with an equally or more convincing timeline, and also urged that Freeman's getting himself to the Wawa, where he could be captured on video, was a "pretty smart" move on his part. [8] App. at 1678.

_____

[8] In concluding that the error was harmful, the District Court recounted a few facts, but viewed them in the light most favorable to the defendant. *See* 517 F. Supp. 3d at 411-12. However, the standard is not whether an alternative explanation exists; it is whether the court is in "grave doubt" over whether the statement influenced the outcome in a "substantial and injurious" way. *O'Neal*, 513 U.S. at 436. In addition, there was some evidence that the District Court did

The weight of the prosecution's case moves the scale in favor of the government and leads us to conclude that Miller's statement did not have a substantial and injurious effect on the jury's verdict. Thus, the *Bruton* violation was harmless error.

## V.    Conclusion

We conclude that the state court's application of *Bruton* was unreasonable. We have noted time and again that substitutions which are merely cosmetic and do not conceal from the jury the actual identity of an anonymized coconspirator, when that coconspirator is sitting at counsel table, are unacceptable and unreasonable under U.S. Supreme Court precedent. We reiterate that principle here.

However, in this case, because there was other and powerful probative evidence of Freeman's guilt presented to the jury and because we are not in "grave doubt" as to the effect of the violative statement, the error was harmless, and so we will reverse the District Court's Order granting habeas corpus relief to Charles Freeman and remand for further proceedings consistent with this opinion.

---

not appear to consider at all in its analysis, including that Freeman was having the interior of his car cleaned the day after police visited him to speak about the murder, that he threw his cell phones in the trash when police showed up to question him, and the precise time and duration of the cell phone calls between Freeman and Collier at and around the time of robbery.